IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

XEROX CORPORATION, :
:
          Plaintiff, :
:
v. : C.A. No. 10-136-LPS
:
GOOGLE INC. and YAHOO! INC., :
:
          Defendants. :

Lawrence C. Ashby, Esquire, John G. Day, Esquire, and Lauren E. Maguire, Esquire of ASHBY & GEDDES, P.A., Wilmington, Delaware.
Richard J. Stark, Esquire and Andrei Harasymiak, Esquire of CRAVATH, SWAINE & MOORE LLP, New York, New York.

Counsel for Plaintiff.

Richard L. Horowitz, Esquire and David D. Moore, Esquire of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware.
Charles K. Verhoeven, Esquire, David A. Perlson, Esquire, and Antonio R. Sistos, Esquire of QUINN EMANUEL URQUHART & SULLIVAN, LLP, San Francisco, California.

Counsel for Defendant Google Inc.

Jack B. Blumenfeld, Esquire, Maryellen Noreika, Esquire, and Jeremy A. Tigan, Esquire of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware.
Matthew B. Lehr, Esquire, Anthony I. Fenwick, Esquire, David J. Lisson, Esquire, and Jeremy Brodsky, Esquire of DAVIS POLK & WARDWELL LLP, Menlo Park, California.

Counsel for Defendant Yahoo! Inc.

**MEMORANDUM OPINION**

August 1, 2011
Wilmington, Delaware.


**Stark, District Judge:**

## I. INTRODUCTION

Plaintiff Xerox Corporation ("Xerox") filed this patent infringement action against Defendants Google, Inc. and Yahoo! Inc. ("Defendants") on February 19, 2010. (D.I. 1) Xerox alleges that Defendants infringe U.S. Patent No. 6,778,979 ("the '979 patent"). (*Id.*)[1] Presently before the Court is the matter of claim construction. Briefing on claim construction was completed on March 26, 2011. (D.I. 141; D.I. 142; D.I. 162; D.I. 163) The Court held a *Markman* hearing on May 19, 2011. *See* Claim Construction Hr'g Tr., May 19, 2011 (D.I. 197) (hereinafter "Tr."). Five terms from claims 1, 2, 18, and 19 of the '979 patent and two order-of-steps requirements are disputed.

The Court also addresses an outstanding discovery dispute that has arisen among the parties.

## II. LEGAL STANDARDS

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). Construing the claims of a patent presents a question of law. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 388-90 (1996). "[T]here is no magic formula or catechism for conducting claim construction." *Phillips*, 415 F.3d at 1324. Instead, the court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform

---

[1] Throughout the remainder of this Memorandum Opinion, references to the '979 patent-in-suit are in the form of "col. ## ll. ##," referring to the applicable column and lines of the '979 patent, respectively.

1

patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). The patent specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent . . . ." *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim

2

term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation marks omitted), *aff'd*, 481 F.3d 1371 (Fed. Cir. 2007).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980. The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

A court also may rely on "extrinsic evidence," which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that

of a person of ordinary skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, while extrinsic evidence "may be useful" to the court, it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19.

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007). Thus, if possible, claims should be construed to uphold validity. *See In re Yamamoto*, 740 F.2d 1569, 1571 (Fed. Cir. 1984).

### III. CONSTRUCTION OF DISPUTED TERMS

    A. **"selected document content"**

        1. Xerox's Construction: "all or part of a document in electronic form"

        2. Defendants' Construction: indefinite

        3. Court's Construction: "all or part of one or more documents"

The claim language and specification support the Court's construction. Together they indicate that queries are generated from one or more documents. (*See* col.76 ll.10-11 ("A method for automatically generating a query from selected document content . . . ."); col.48 ll.27-

30 ("*[O]ne or more* documents relating to a task are identified and uploaded to the meta-document server 200. From these documents queries are generated for specific services automatically . . . .") (emphasis added); *see also* Tr. at 12) While the claims do not indicate if a portion of the documents can be used in the patented method; the specification does. (*See* col.48 ll.52-55, 58-60; col.50 ll.21-25) There is no basis for limiting the term only to electronic documents. (*See* col.6. ll.52-53; col.14 ll.60-61)

For a claim term to be found indefinite, the party asserting invalidity must show by clear and convincing evidence that a person of ordinary skill in the art, after reading the claims, specification, and prosecution history, would be unable to understand the bounds of the claim – i.e., the claim must be "insolubly ambiguous" after all reasonable attempts at construction. *See Exxon Res. & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). A claim is not indefinite if it is amenable to construction, "even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree." *Id.* "The standard of indefiniteness is somewhat high; a claim is not indefinite merely because its scope is not ascertainable from the face of the claims." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1342 (Fed. Cir. 2003).

This term is amenable to construction and, therefore, not indefinite. *See generally Honeywell Int'l, Inc. v. U.S.*, 609 F.3d 1292, 1302 (Fed. Cir. 2010) ("[B]ecause [the disputed term] is amenable to construction and is not insolubly ambiguous, . . . the [defendant] did not meet its burden of proving that claim 2 is indefinite."). "All or part" in the adopted construction gives meaning to "selected;" the preambles of the claims provide an antecedent basis for all subsequent uses of the term in limitations. *See Energizer Holdings, Inc. v. Int'l Trade Comm'n,*

435 F.3d 1366, 1371 (Fed. Cir. 2006).

   B.  **"classification label"**

      1. Xerox's Construction: "a label in any format that identifies a category in the organized classification of document content"

      2. Defendants' Construction: "classifying word or phrase"

      3. Court's Construction: "a label in any format that identifies a category in the organized classification of document content"

The Court's construction is supported by the claim language and specification. (*See* col.76 ll.12-17; *see also* col.49 ll.18-30) This construction clarifies the meaning of the term by indicating the function that the classification labels perform: identifying classification categories for documents. (*See* col.49 ll.31-32; *see also IBM Dictionary of Computing* 324 (10th ed. 1994), D.I. 142 Ex. J ("label . . . (2) An identifier within or attached to a set of data elements.")) Although the patent discloses classification labels that are words (*see, e.g.*, '979 patent fig. 39), there is no support in the specification to limit this term only to words or phrases. *See Phillips*, 415 F.3d at 1323.

   C.  **"categorizing the selected document content using the organized classification document content for assigning selected document content a classification label"**

      1. Xerox's Construction: "determining the subject matter of the selected document content using one or more of the categories defining the organized classification of document content and assigning the corresponding classification label(s) to the selected document content"

      2. Defendants' Construction: "using the organized classification of document content to categorize the selected document content and to assign to the selected document content a single classification label"

      3. Court's Construction: "determining the subject matter of the selected document content using one or more of the categories defining the

organized classification of document content and assigning the corresponding classification label(s) to the selected document content"

The Court's construction is supported by the claims (*see* col.76 ll.10-17, 21-26) and specification (*see, e.g.*, col.3 ll.9-10; col.41 ll.53-60; col.42 ll.56-60; col.45 ll.41-53; col.48 ll.52-55; col.49 ll.18-32; col.50 ll.1-11; col.51 ll.33-35, 39-41). "Determining the subject matter" clarifies the meaning of "categorizing." *See generally U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims."). This construction also incorporates the stipulated meaning of "organized classification document content," i.e., a "set of categories that can be used to describe the subject matter of document content." (D.I. 133 at 3)

The main dispute is whether more than one classification label can be assigned. The Court finds that multiple classification labels may be used. In patent claims, the word "a" is generally understood to mean "one or more." *See KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) ("This court has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'"). The specification confirms this meaning here. (*See, e.g.*, col.4 ll.62-64; col.49 ll.18-20, 31-48; col.50 ll.1-6) The Court is unpersuaded that any exception to this rule of construction applies here.[2] Defendants have shown no clear intent by the patentee to limit "a" to "one." *See Baldwin Graphics Sys., Inc., v. Siebert, Inc.*, 512 F.3d 1338, 1342

---

[2]The argument that the patented method identifies multiple categories but assigns only one label is baseless and equally insufficient to overcome the rule regarding the conventional meaning of "a" in patent claims.

(Fed. Cir. 2008) ("That 'a' or 'an' can mean 'one or more' is best described as a rule, rather than merely as a presumption or even a convention. The exceptions to this rule are extremely limited: a patentee must evince a clear intent to limit 'a' or 'an' to 'one.'") (internal quotation marks omitted).

    **D.    "Query"**

        1.    <u>Xerox's Construction</u>: "a set of data specifying search criteria"

        2.    <u>Defendants' Construction</u>: "request for search results"

        3.    <u>Court's Construction</u>: "request for search results"

The Court's construction is supported by the claims and specification. (*See* col.76 ll.10-11, 27-31; col.77 ll.14-18; col.78 ll.6-9; col.48 ll.22-25, 40-51; col.49 ll.9-16, 49-67; *see also* col.30 ll.21-32) At the hearing the parties agreed the query need not be executed or results obtained. (*See* Tr. at 88) The patented method (of claims 1 and 18) figures out a question, but need not ask it. Xerox condemns the construction's focus on the query results rather than content. The content is articulated in the limitations of the claims; there is no requirement that results be obtained. (*See, e.g.*, col.76 ll.10-31) The adopted construction makes clear that the query only has to be "formulated," not executed.

    **E.    "To restrict a search at the information retrieval system for information concerning the set of entities to the category of information in the information retrieval system identified by the assigned classification label"**

        1.    <u>Xerox's construction</u>: "the set of data specifying search criteria includes data items corresponding to one or more entities identified in the 'automatically identifying' step and one or more classification labels assigned in the 'automatically categorizing' step"

8

2. Defendants' construction: "to confine a search at the information retrieval system to the category of information identified by the assigned classification label, where the search seeks information concerning the set of entities"

3. Court's Construction: "to confine a search at the information retrieval system to the category of information identified by the assigned classification label(s), where the search seeks information concerning the set of entities"

The intrinsic evidence supports the Court's construction. (*See* col.76 ll.27-31 (claim 1); col.78 ll.32-36 (claim 18); col.3 ll.11-15; col.48 l.63-col.49 l.16; col.49 ll.32-48; D.I. 141 Ex. B at 7 (prosecution history)) The patented method can use multiple classification labels (*see infra* Part III.C), which the Court's construction accommodates. "To confine" clarifies that the searched data are reduced through the label assignment. The parties agree this is the purpose of the patented method: generating a narrowed query of improved quality. (*See* col.48 ll.37-39; D.I. 141 at 7; D.I. 163 at 8; *see also* Tr. at 5) Even if numerous labels are assigned (and multiple categories searched), this purpose is still realized through a more focused query.

Xerox's construction is deficient: it is grammatically inconsistent with the construed term (i.e., a verb – "to restrict" – is replaced with a noun – "the set of data"); it incorporates the restricting function only indirectly (with the classification labels in the search criteria), which will likely confuse the jury; and it neglects the distinction between entities (what is searched for) and categories (what is searched).

9

### F. Order-of-Steps (Claim 1 and 18)

1. Xerox's Construction: In claim 1, step (a) must be performed before steps (c) and (d), step (b) must be performed before the completion of step (d), step (c) must be performed before completion of step (d); and in claim 18, step (c) must be performed before steps (e) and (f), step (d) must be performed before the completion of step (f), step (e) must be performed before the completion of step (f)

2. Defendant's Construction: In claim 1, step (a) must be performed before steps (c) and (d), step (b) must be performed before step (d), step (c) must be performed before step (d); and in claim 18, step (c) must be performed before steps (e) and (f), step (d) must be performed before step (f), step (e) must be performed before step (f)

3. Court's Construction: In claim 1, step (a) must be performed before steps (c) and (d), step (b) must be performed before the completion of step (d), and step (c) must be performed before completion of step (d); and in claim 18, step (c) must be performed before steps (e) and (f), step (d) must be performed before the completion of step (f), and step (e) must be performed before the completion of step (f).

### G. Order-of-Steps (Claim 2 and 19)

1. Xerox's Construction: the step of claim 2 must be performed during or after the completion of step (d) of claim 1; and the step of claim 19 must be performed during or after the completion of step (f) of claim 18

2. Defendants' Construction: the steps of claim 1 must be performed before the step of claim 2; and the steps of claim 18 must be performed before the step of claim 19.

3. Court's Construction: the step of claim 2 must be performed during or after the completion of step (d) of claim 1; and the step of claim 19 must be performed during or after the completion of step (f) of claim 18.

The Court's constructions with respect to the various order of steps disputes follow Federal Circuit precedent and are supported by the claim language and specification. "Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one." *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001). Courts

look "to the claim language to determine if, as a matter of logic or grammar, [the steps] must be performed in the order written." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003). If not, courts "next look to the rest of the specification to determine whether it directly or implicitly requires such a narrow construction." *Id.* (internal citations omitted). If it does not, there is no order requirement. *See id.*

The claims contain no basis to require that the "formulating the query" step begin only after the "identifying" and "categorizing" steps are completed or that the "adding terms" step (of claims 2 and 19) occur only after completion of the "formulating" step. (*See* col.76 ll.10-35; col.78 ll.10-41; *see generally Bell Commc'ns Research, Inc. v. Fore Sys., Inc.*, 62 Fed. App'x 951, 955 (Fed. Cir. 2003) ("[N]either logic, grammar, nor the specification compels the conclusion that 'generating' must be complete before 'filling' may begin.")) Logically, the "defining" step must be completed before the "categorizing" step, but this does not preclude concurrent execution of the other steps. *See Baldwin*, 512 F.3d at 1345 ("Though the claims, specification, and prosecution history require that the air content of the cleaning fabric be reduced prior to saturation, this does not mean that the air content must be reduced prior to winding on the roll."); *cf. E-Pass Techs., Inc. v. 3Com Corp*, 473 F.3d 1213, 1222 (Fed. Cir. 2007) ("[B]ecause the language of most of the steps of its method claim refer to the completed results of the prior step, E-Pass must show that all of *those* steps were performed in order.") (emphasis added).

The specification provides no order-of-steps requirement either. Defendants identify no unequivocal preclusion of an order different than the order they propose as the Court's construction. *See Baldwin*, 512 F.3d at 1346 ("But this language, like the other passages cited by

11

the district court, does not unequivocally preclude a different order of steps, and this court sees no justification in the specification for imposing a temporal constraint on claim 14 that is not required by or implicit in the language of the claim itself."). To the contrary, the specification discusses and contemplates concurrent performance of steps. (*See* col.48 ll.63-66; col. 49 ll.31-37; col.75 ll.15-22; fig.38; *see also Bell Commc'ns*, 62 Fed. App'x at 956 ("Given that the specification discloses features of the overhead field that would permit filling to begin before generation is complete, it would be error to impose upon the claims a requirement that filling cannot begin until one or more empty frames are generated completely."))

## IV. DISCOVERY DISPUTE

Pursuant to the Court's procedures, the parties submitted letters on June 23 and 24, 2011 addressing a discovery dispute (D.I. 202; D.I. 205). The Court heard argument on the dispute on June 29, 2011. (*See* D.I. 219) The Court now rules on the pending dispute.

By their letter, Defendants seek production of documents Xerox exchanged with third-party IPValue Management, Inc. ("IPValue"). (D.I. 202) Xerox listed such documents on its privilege log and has refrained from producing these documents based on its assertion of a common interest privilege. Defendants contend that Xerox has failed to show the existence of a common legal interest with IPValue, as Xerox's relationship with IPValue is purely commercial, and, therefore, outside the scope of the common interest privilege. Xerox opposes Defendants' request. In Xerox's view, both it and IPValue retain attorneys who perform legal analyses on issues relating to patent rights; and "because achieving Xerox's and IPValue's joint objective of successfully asserting Xerox intellectual property requires close cooperation between the companies, including regarding the numerous legal matters that arise, both companies routinely

share privileged information with each other." (D.I. 205 at 1)

IPValue is a patent licensing company that helps patentees commercialize their patent portfolios. (D.I. 202 at 1) Xerox and IPValue have entered into agreements that designate IPValue as Xerox's worldwide agent for intellectual property licensing. (D.I. 205 at 1) Xerox represents that it has produced – and is not asserting a common interest privilege with respect to – communications between Xerox and IPValue that did not relate to confidential legal advice. (D.I. 205 at 3)

The Court will deny Defendants' request. Xerox has met its burden (including by submitting affidavits from itself and IPValue as well as the agreements between them) of establishing that a common interest privilege exists between it and IPValue. Xerox and IPValue had an allied, uniform, agency relationship. The relationship between these two entities is sufficiently imbued with common legal interests in that it plainly relates to litigation. Among the tasks Xerox retained IPValue to assist with is licensing strategy and patent enforcement, including litigation. Because IPValue's compensation from Xerox is based on a contingency fee, Xerox and IPValue share a common interest in Xerox prevailing in the instant litigation and the two companies have operated with the expectation that any shared privileged communications would be kept confidential and protected from disclosure.

The circumstances here are unlike those presented in *Leader v. Facebook*, in which this Court found no common interest existed between a patentee and potential investors in litigation to enforce the patentee's patent rights. *See generally* 2010 WL 845980 (D. Del. Feb. 22, 2010). In *Leader*, the documents as to which privilege was being asserted were created at a time when the patentee and the potential investors were negotiating at arms-length; at that time, no common

13

interest existed. Here, by contrast, the documents over which Xerox is asserting privilege relate exclusively to a time frame in which IPValue was already retained by, and working for and with, Xerox.

Defendants emphasize that an IPValue vice-president stated in related litigation, when asked by the Court about IPValue's "contingent fee interest" in the success of Xerox's litigation, "I'm not sure I would call that an interest." (D.I. 219 at 5, 22) The legal inquiry into whether an "interest" exists for purposes of the common interest privilege is not dependent on one non-party representative's subjective (and uncertain) belief.

Accordingly, the Court will deny Defendants' request that Xerox be ordered to produce the documents withheld on the basis of a common interest privilege.